*Bd. of Educ. of the Yorktown Cent. Sch. Dist. v. C.S.*

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2019

(Argued:  December 5, 2019      Decided:  March 3, 2021)

Docket No. 19-270

BOARD OF EDUCATION OF THE YORKTOWN CENTRAL SCHOOL DISTRICT,

*Plaintiff–Counter-Defendant–Appellant,*

–v.–

C.S., INDIVIDUALLY AND ON BEHALF OF M.S., A MINOR,
S.S., INDIVIDUALLY AND ON BEHALF OF M.S., A MINOR,

*Defendants–Counter-Claimants–Appellees.*

B e f o r e :

JACOBS, CARNEY, and PARK, *Circuit Judges.*

This Individuals with Disabilities Education Act ("IDEA" or the "Act") case presents the question whether a school district can unilaterally amend an individualized education program ("IEP") during the thirty-day "resolution period" that follows a parent's filing of a due process complaint. *See* 20 U.S.C. §§ 1400 *et seq*. The first IEP that the school district prepared for the child and presented to the parents indicated erroneously that the child would be placed in a 12-student classroom, which the parents deemed insufficient. But the parents had reason to believe that the school

district would actually be providing a 15-student class (which they evidently deemed also insufficient); and they enrolled the child at a private school. That original IEP was deficient because it specified a class size that the district was never in fact going to provide. After the parents filed their due process complaint, the school district sought to cure this deficiency by unilaterally amending the original IEP to reflect that the student would be in a 15-student class. The district court found that the school district did not effectively amend the IEP, determined that the unamended IEP denied the child a FAPE because it promised what would not be done, and therefore ordered the school district to reimburse the parents for the private school tuition.

We affirm, holding that the IDEA does not permit a school district to amend an IEP unilaterally during the thirty-day resolution period. The Act envisions the resolution period as a time for mediation and agreement, not one-sided action.

AFFIRMED.

———————

MARK CRAIG RUSHFIELD, Shaw, Perelson, May & Lambert, LLP, Poughkeepsie, NY, *for Board of Education of the Yorktown Central School District*.

JASON STERNE (Kerry Margaret McGrath, Cuddy Law Firm, P.L.L.C., Valhalla, NY, *on the brief*), Sterne & Walsh, Rochester, NY, *for C.S. and S.S.*

ANDREW A. FEINSTEIN, Esq., Mystic, CT (Ellen Saideman, Esq., Barrington, RI, *on the brief*), *for* Amicus Curiae *Council of Parent Attorneys and Advocates, Inc.*

James Arden, Hilary R. Hoffman, and Graham L. Travaglini, Sidley Austin LLP, New York, NY, *for* Amici Curiae *Mobilization for Justice, Inc., The Legal Aid Society, Advocates for Children of New York, Legal Services NYC, Brooklyn Defender Services, New York Legal Assistance Group, and New York Lawyers for the Public Interest.*

———————

2

CARNEY, *Circuit Judge*:

This Individuals with Disabilities Education Act ("IDEA" or the "Act") case presents the question whether a school district can unilaterally amend an individualized education program ("IEP") during the thirty-day "resolution period" that follows a parent's filing of a due process complaint. The first IEP that the school district prepared for the child and presented to the parents indicated erroneously that the child would be placed in a 12-student classroom, which the parents deemed insufficient. But the parents had reason to believe that the school district would actually be providing a 15-student class (which they evidently deemed also insufficient); and they enrolled the child at a private school. That original IEP was deficient because it specified a class size that the district was never in fact going to provide. After the parents filed their due process complaint, the school district sought to cure this deficiency by unilaterally amending the original IEP to reflect that the student would be in a 15-student class. The district court found that the school district did not effectively amend the IEP, determined that the unamended IEP denied the child a free appropriate public education ("FAPE") because it promised what would not be done, and therefore ordered the school district to reimburse the parents for the private school tuition.

On appeal, the school district points to language in *R.E. v. New York City Department of Education*, 694 F.3d 167 (2d Cir. 2012), in support of its position that the IDEA permitted it to amend the student's IEP unilaterally during the thirty-day "resolution period" that follows a parent's filing of a due process complaint that challenges a school's IEP. But, as we discuss below, that language was not part of the holding of *R.E.* and did not definitively construe the IDEA. Looking at the text and structure of the IDEA, we conclude that the statute does not permit a school district to amend an IEP unilaterally during the thirty-day resolution period. The Act envisions the resolution period as a time for mediation and agreement, not one-sided action.

3

Adhering to the IDEA's requirements for the resolution period is of particular importance in cases like this one, where parents withdraw their child from the public school and seek reimbursement for the costs of a different school, relying on the contents of a written IEP when making that decision.

We affirm the district court's judgment.

## BACKGROUND

### I.      The Individuals with Disabilities Education Act (the "IDEA")

Under the IDEA,[1] the federal government provides funding to states in support of special education programs and services for children with disabilities. *See* 20 U.S.C. § 1411. The availability of federal funding is conditioned upon a state's submission to the Secretary of Education of a plan adequately ensuring that a FAPE "is available to all children with disabilities residing in the State." *Id.* § 1412(a)(1)(A). The Act requires participating states to identify all children with disabilities "who are in need of special education" and who reside within their borders; for each such child, they must develop an appropriate "individualized education program" ("IEP"). *Id.* § 1412(a)(3)-(4).

The Department of Education has defined a "free appropriate public education" under the IDEA as an education provided at public expense, meeting state standards, and provided "in conformity with an [IEP]." 34 C.F.R. § 300.17. In New York state, IEPs are developed by "committees on special education" ("CSEs") convened in each school

---

[1] When first passed in 1975, the IDEA was entitled the Education for All Handicapped Children Act, Pub. L. No. 94-142, 89 Stat. 773 (codified as amended at 20 U.S.C. §§ 1400-1482, 9567-9567b). In this Opinion, however, as in most contemporary case law, we refer to the statute as the Individuals with Disabilities Education Act, or IDEA, the name adopted in 1990, when Congress substantially amended the 1975 enactment. The IDEA was further amended in 2004 and reauthorized as the Individuals with Disabilities Education Improvement Act ("IDEIA"), Pub. L. No. 108-446, 118 Stat. 2647, but its common name has not changed.

district for each covered child.[2] N.Y. Educ. Law § 4402(1)(b)(1). Generally, a child's CSE includes the child's parents, some of the child's teachers, a school district representative, and a school psychologist; it may also include another parent in the school district as well as other individuals with relevant specialized knowledge.[3] *See id.*; N.Y. Comp. Codes R. & Regs. tit. 8, § 200.3(a)(1)(i)-(x).

Under the IDEA, the process of developing an IEP is a collaborative one. The Act requires that parents be permitted to "examine all records relating to [their] child and to participate in meetings with respect to the identification, evaluation, and educational placement of the[ir] child." 20 U.S.C. § 1415(b)(1). By regulation, a child's CSE must consider the parents' concerns regarding their child's education as it formulates the IEP. 34 C.F.R. § 300.324(a)(1)(ii). Further, among other required features, an IEP must set forth in writing the effects of the child's disability on the child's ability to learn and list any special services that the school district commits to providing the child to address those effects. *See id.* § 300.320. It must set annual educational goals for the child and describe the child's progress toward past goals. *Id.* Furthermore, and of particular

---

[2] The IDEA's procedural requirements apply generally to states' "local educational agencies." *See, e.g.*, 20 U.S.C. § 1414(a)(2)(A) ("A local educational agency shall ensure that a reevaluation of each child with a disability is conducted in accordance with subsections (b) and (c) . . . ."). Because a school district is the relevant local educational agency in this case, we use "school district" when describing IDEA requirements; in other contexts, these obligations may apply to other local entities.

[3] In New York state, a school district often designates a core CSE composed of professional personnel active in the disability education field, and supplements that core in individual cases with the parent or parents of the child with special needs, and other individuals with particular knowledge relevant to the child. *See* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.3(a)(1)(ix) (requiring CSEs to include "other persons having knowledge or special expertise regarding the student, including related services personnel as appropriate, as the school district or the parent(s) shall designate," with the "determination of knowledge or special expertise . . . made by the party (parents or school district) who invited the individual to be a member").

concern here, the school district must keep a child's IEP current through a process of annual review and revision. 20 U.S.C. § 1414(d)(4)(A).

## II.     Factual and Procedural History[4]

M.S., the student, was born in 2004. C.S. is her mother and S.S. is her father. She has been diagnosed with Tourette's syndrome, attention deficit hyperactivity disorder ("ADHD"), developmental coordination disorder, and central auditory processing disorder. She is classified as learning disabled under the IDEA.

M.S. attended public schools in the Yorktown Central School District ("Yorktown" or "the District") in Yorktown Heights, New York, from kindergarten through fifth grade. When M.S. was in the second grade, a school psychologist recommended that she be evaluated by a CSE convened by the District.[5]

### A.     Third Grade Through Sixth Grade

A CSE first met to consider M.S.'s needs in May 2012, at the end of her second-grade year, and produced an IEP that took effect at the beginning of her third-grade year. According to C.S., in third and fourth grade M.S. received support from the District based on her IEP, but she "continued to struggle" academically and socially. Jt. App'x 395.

During a meeting with the CSE in January 2015, in the middle of M.S.'s fifth-grade year, C.S. and S.S. reviewed M.S.'s recent test scores and became concerned about

---

[4] We set forth the facts as presented in the district court opinion. They are generally undisputed; we note any exceptions.

[5] In her second-grade year, M.S. took the Wechsler Individual Achievement Test – Third Edition (WIAT-III) and scored in the 14th percentile for reading and 4th percentile for mathematics. Those results were submitted to the CSE.

whether she was learning.[6] Acting on this concern, the parents had her independently evaluated by Dr. Nelson J. Dorta, a pediatric neuropsychologist. Dr. Dorta concluded that M.S. was "not progressing" academically. Jt. App'x 586. Based on M.S.'s "poor academic trajectories," Dr. Dorta recommended that M.S.'s parents consider enrolling her in a school specially designed for children with language-based learning disabilities. Jt. App'x 587.

At the end of her fifth-grade year, M.S.'s parents attended a CSE meeting to discuss her sixth-grade IEP. Her fifth-grade IEP had capped her class size at twelve students and provided that the class would be staffed with one teacher and one teaching aide—a formula known as a "12:1+1" class. At the CSE meeting, C.S. and S.S. pressed for changes to M.S.'s IEP, drawing on Dr. Dorta's recommendations. As C.S. later recounted, however, Yorktown recommended for M.S.'s sixth grade year "essentially the same program that [M.S.] had had for fifth grade": a 12:1+1 class.[7] Jt. App'x 399. In the parents' estimation, the District did not sufficiently revise M.S.'s IEP in response to her recent history and circumstances.

After discussion with Dr. Dorta, the parents decided to enroll M.S. in a sixth-grade class at Eagle Hill School ("Eagle Hill"), a private school that specializes in teaching students with learning disabilities. According to C.S., once M.S. started classes

---

[6] In some instances, just C.S. (M.S.'s mother) participated in proceedings relevant here; in other cases, both C.S. and S.S. did. Because the differentiation has no substantive impact, for the sake of convenience we regularly refer to C.S. and S.S. either together or individually simply as "the parents."

[7] M.S.'s sixth-grade IEP provided for a 5:1 special reading class, which had not been part of M.S.'s fifth-grade IEP. For ease of reference, we will describe the relevant IEPs by the class size provided for most, though not all, academic subjects. Thus, we cite M.S.'s sixth-grade IEP as providing for a "12:1+1 class," recognizing that M.S. would have been placed in a smaller class for reading under the terms of the IEP. Where relevant, we remind the reader of the precise terms of the IEP.

at Eagle Hill "the change in her was like night and day." Jt. App'x 400. C.S. reported that M.S.'s reading, language, and social skills improved over the course of the year. Standardized tests administered in Fall 2015 and Spring 2016 provide support for the view that M.S.'s reading ability improved in that period.

In December 2015, several months into M.S.'s sixth-grade year, C.S. filed a due process complaint against the District contending, among other things, that Yorktown's IEP for M.S.'s sixth-grade year denied M.S. a FAPE.[8] *See C.S. v. Yorktown Cent. Sch. Dist.*, No. 16-cv-9950 (KMK), 2018 WL 1627262, at *4-5 (S.D.N.Y. Mar. 30, 2018). C.S. unsuccessfully sought reimbursement for the cost of sending M.S. to Eagle Hill for that year. *Id.* at *5. In 2018, a district court affirmed the decision of a state review officer ("SRO") denying reimbursement, both the SRO and the district court having determined that the District's IEP for the 2015-16 year was sufficient. *Id.* at *8, 27. The parents did not appeal that denial.

B.      M.S.'s Seventh-Grade IEP

On June 9, 2016, the District convened M.S.'s CSE to develop an IEP for her seventh-grade year, scheduled to begin in September 2016. C.S. attended this meeting, as did representatives of the District and teachers from Eagle Hill who were familiar with M.S. from her sixth-grade year.

At the June 9 meeting, C.S. expressed concerns about the likely size of M.S.'s classes if she returned to Yorktown. As mentioned above, for her sixth-grade year, the District provided M.S. an IEP specifying a 12:1+1 class, but C.S. said that she feared that classes of that size in M.S.'s seventh-grade year would be too large and would inhibit

_____

[8] We discuss the IDEA's rubric of a "due process complaint" below, in Part II.E. *See also* 20 U.S.C. § 1415.

8

M.S.'s social and emotional development. (At Eagle Hill, her classes were substantially smaller.)

The parties disagree about what exactly was communicated at the June 9 meeting. According to the District, C.S. was told definitively that at Yorktown, M.S. would be placed in a 15:1+1 class. C.S. acknowledges that special education teacher Susan Sabella told her during the meeting that M.S. would be in a fifteen-student class "because"—as C.S. testified that Sabella explained to her—"when the students go to seventh grade the group size changes to a group of 15." Jt. App'x 405. C.S. nonetheless avers that she left the meeting unsure from the whole of the conversation whether M.S. would be placed in a twelve-student class or a fifteen-student class if she were to attend middle school in the Yorktown School District.

That day, after the meeting ended, C.S. emailed Michael Rosen, Yorktown's Director of Pupil Personnel Services and Chairperson of M.S.'s CSE. She asked Rosen for permission to visit the Yorktown middle school that M.S. would attend, to observe classes there, and to speak with the seventh-grade teachers. About one week later, Rosen agreed to arrange a visit.

Toward the end of June, C.S. visited the Yorktown middle school and met with teachers there. She spoke with the teachers about their qualifications, about how M.S.'s classes would be run, and about how M.S.'s time during the school day would be structured. C.S. recalled in particular that she asked the teachers if M.S.'s class in seventh grade would be 12:1+1 or 15:1+1, and that "[t]hey all said yes, it's 15:1[+1]." Jt. App'x 416.

C.    Ten-Day Notice and M.S.'s Enrollment at Eagle Hill

Yorktown did not provide C.S. and S.S. with a written IEP for M.S.'s seventh-grade year at or immediately after the June CSE meeting, or after C.S.'s June visit to the

9

middle school. As of August 17, in fact, the parents had still neither received a copy nor been able to review a written statement of M.S.'s final IEP for the upcoming academic year. They gave Yorktown notice by letter of that date that they intended to enroll M.S. at Eagle Hill for her seventh-grade year.

In their notice, they described their objections to what they understood Yorktown's proposed IEP to be:

> The District failed to recommend a small class that utilizes research-based multisensory methods or provides the speech/language support [M.S.] needs. The District also failed to recommend a program to address [M.S.'s] social and emotional needs or a program that would be able to address [M.S.'s] math disability, dyscalculia. To date, we have not received a copy of the IEP and have not been able to review the final recommendations by the CSE. At this time, we disagree with the recommendations of the CSE. We do not believe that the IEP, program, or placement will provide the services and supports that [M.S.] requires to make educational progress. Absent an appropriate District program, we intend to send [M.S.] to Eagle Hill School . . . at public expense for the 2016-2017 school year. We will be looking to the District for payment/reimbursement of all tuition costs and the cost of any and all related services including transportation costs.

Jt. App'x 641-42. In their letter, the parents did not specify the class size that they understood Yorktown to offer; rather, they generally objected to Yorktown's failure to "recommend a small class." *Id.* at 641. The record is not clear when Yorktown received the parents' letter, but it appears to have been delivered not long after the August 17 date that appears on its face.

D.     The Process for Contesting an IEP Generally, and for M.S.

In notifying Yorktown of their intention to enroll M.S. at Eagle Hill, C.S. and S.S. were taking the first step in the multi-layered scheme prescribed by the IDEA for parents desiring to contest that a school district has provided a FAPE for their child.

10

The details of that process lie at the core of this case and so we take a step back to review them.

The IDEA empowers parents to bring a state administrative challenge—and, eventually, a challenge in state or federal court—to obtain an impartial evaluation of whether a school district's proposed IEP provides or denies their child a FAPE. *See* 20 U.S.C. § 1415. Instead of requiring that parents send their child for an extended period to a public school that offers a program the parents believe to be inadequate to their child's needs, the IDEA further authorizes parents to enroll their child unilaterally in a private school and, in challenging their child's proposed IEP, to seek reimbursement for tuition at the private school that in their view provides a suitable program. 20 U.S.C. §§ 1412(a)(10)(C)(ii). In this way, the Act seeks to reduce the chances that the child in need will effectively lose a school year while legal (and largely financial) rights and obligations are sorted out.

If parents decide to make a private placement and intend to seek tuition reimbursement, the first step is generally for them to give the school district ten days' prior written notice of their intention and to include in that notice a statement of their concerns regarding the school district's proposed IEP. The statute and regulations do not affirmatively require such notice or bar parents from enrolling their child in another school without such notice, but they establish a powerful incentive to give such notice by providing that reimbursement may be "reduced or denied" if parents fail to follow this procedure. *See* 20 U.S.C. § 1412(a)(10)(C)(iii)(I) (absent prior notice, reimbursement may be reduced or denied); 34 C.F.R. § 300.148(d) (same); *see also Forest Grove Sch. Dist. v. T.A.*, 557 U.S. 230, 240-41 (2009) (discussing circumstances under which court may reduce or deny reimbursement under 20 U.S.C. § 1412); *M.C. ex rel. Mrs. C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 68 (2d Cir. 2000) ("[C]ourts have held uniformly that reimbursement is barred where parents unilaterally arrange for private educational

11

services without ever notifying the school board of their dissatisfaction with their child's IEP.").[9] The ten-days' notice requirement makes it possible for the public school to reassess the IEP and cure any deficiency in it, thus minimizing the school's expenses by allowing it to adjust its plans and provide the child with what the parents, at least, consider to be a FAPE. *See M.C.*, 226 F.3d at 68; *also J.S. v. Scarsdale Union Free Sch. Dist.*, 826 F. Supp. 2d 635, 672 (S.D.N.Y. 2011).

Even if parents give a school district timely notice of their intention to place their child in a private school, however, a court may reduce or deny reimbursement if the parents act unreasonably in their dealings with the school district—for example, by being uncooperative with its efforts to resolve their concerns during the ten-day notice period. 20 U.S.C. § 1412(a)(10)(C)(iii)(III); *cf. Carmel Cent. Sch. Dist. v. V.P. ex rel. G.P.*, 373 F. Supp. 2d 402, 418 (S.D.N.Y. 2005) (denying reimbursement where parents "refused to cooperate with the local school district's effort to devise a public school-based program for their child"). Claims for reimbursement are thus subject to statutory and judicially imposed constraints.

Turning back to the specifics of the parents' claim for reimbursement here: In their August 17, 2016 letter, the parents notified the District that they intended to enroll M.S. at Eagle Hill. Although the date of the District's receipt of the letter is disputed, the parties agree that Yorktown did not contact the parents during the ten days thereafter to attempt to resolve the parents' objections. On either August 30 or August 31, 2016, however, after the ten-day notice period expired, C.S. and S.S. received a written version of M.S.'s seventh-grade IEP. (Although this IEP purports to reflect discussions that occurred at the June CSE meeting, we will refer to it as the "August IEP" because it

[9] Unless otherwise noted, in text quoted from caselaw, this Opinion omits all alterations, citations, footnotes, and internal quotation marks.

was not delivered in writing until August.) Neither party disputes that the August IEP advised the parents that M.S. would be placed in a 12:1+1 class, not a 15:1+1 class.

C.S. recalled being "confused" upon receiving the written IEP: the District teachers had told her, she thought, that M.S.'s classes at Yorktown would necessarily be 15:1+1, not 12:1+1, because of the typical size of seventh-grade classes at the middle school. Jt. App'x. 416-17. According to C.S., it was after she and S.S. received the August IEP informing them of a 12:1+1 plan that they definitively decided to place M.S. at Eagle Hill for her seventh-grade year. (Recall that their August 17 letter advised that "at this time, we disagree with the recommendations of the CSE" after pointing out that "[t]o date, we have not received a copy of the IEP and have not been able to review the final recommendations by the CSE." Jt. App'x 641.)

M.S. began school at Eagle Hill on September 6, 2016.

E.     Due Process Complaint

If parents and a school district cannot resolve the parents' concerns during the ten-day notice period and the parents proceed to enroll their child in a private school, the parents may then seek reimbursement from the state by filing a "due process complaint" with a designated state administrative agency. 20 U.S.C. § 1415(b)(7)(A). The due process complaint must identify what the parents view as the IEP's deficiencies. *Id.* § 1415(b)(7)(A)(ii)(III).

C.S. and S.S. submitted a due process complaint about M.S.'s seventh-grade IEP by letter dated September 26, 2016. In the complaint, they charged that Yorktown failed to provide M.S. with a FAPE for the 2016-17 school year, then just beginning. C.S. and S.S. highlighted a fundamental contradiction: "[S]chool personnel told the[m] . . . that seventh grade classes contain 15 students," but the written IEP that the District provided "requires a 12:1+1 ratio." Jt. App'x 515. The parents further contended that

13

Eagle Hill was an appropriate placement for M.S. and that they were entitled to reimbursement for the cost of sending M.S. to Eagle Hill for her seventh-grade year.

F. Thirty-Day Resolution Period

Once a due process complaint has been filed, a school district must arrange a meeting between the parents and the relevant members of the CSE to occur within fifteen days of the filing. 20 U.S.C. § 1415(f)(1)(B). This is called the "resolution session," *id.*, or "[r]esolution meeting," 34 C.F.R. § 300.510(a). The purpose of the resolution session is "for the parent of the child to discuss the due process complaint, and the facts that form the basis of the due process complaint, so that the [school district] has the opportunity to resolve the dispute that is the basis for the due process complaint." *Id.*

In addition to requiring a timely resolution session, the statute gives the school district thirty days from the filing of the due process complaint to "resolve[] the complaint to the satisfaction of the parents." 20 U.S.C. § 1415(f)(1)(B)(ii). This is called the "resolution period." 34 C.F.R. § 300.510(b). If the parents and the school district resolve the complaint during the resolution session, they must execute a written settlement agreement, which either can then enforce in state or federal court. 20 U.S.C. § 1415(f)(1)(B)(iii); N.Y. Educ. Law § 4404(1)(b). The school district and the parents may also agree to enter mediation instead of participating in the resolution session; they may also agree in writing to waive the resolution session requirement altogether. 20 U.S.C. § 1415(f)(1)(B)(i). If the parties resolve the dispute by mediation, they must sign a legally enforceable settlement agreement setting forth the terms of the resolution. *Id.* § 1415(e)(2)(F).[10]

---

[10] If they are unable to resolve their differences during this period, they may proceed to the due process hearing stage, which we describe below in subsection G.

On October 7, 2016, C.S. and S.S. attended a resolution session with Rosen and another Yorktown representative. Regarding the District's class-size recommendation, Rosen stated at the session that the written IEP sent to the parents at the end of August mistakenly showed a 12:1+1 class as its recommendation and should have listed a 15:1+1 class size. The resolution session ended without a settlement.

About two weeks later, by letter dated October 21, 2016, Yorktown provided the parents with a written response to their due process complaint. Addressing the proposed class size issue, Yorktown wrote:

> The District's CSE recommended an appropriate size class for each of the student's special education classes. The CSE also considered and appropriately rejected other class sizes. To the extent that the 2016-2017 IEP misidentified the class sizes recommended for student, such mistake was corrected at the Resolution Session and the correct size of special education classes are [sic] identified on the IEP issued as a result of the Resolution Session.

Jt. App'x 461.

As of October 21, however, Yorktown had not sent the parents an "IEP issued as a result of the Resolution Session"; Yorktown did not send the parents a revised IEP until October 27, 2016 (the "October IEP"). The October IEP provided that M.S. would attend a 15:1+1 class for each of her academic subjects.[11] Yorktown concedes that it sent the revised IEP to the parents thirty-one days after the date of their due process complaint, Appellant's Br. 8, and thus outside the thirty-day resolution period during which a school district is entitled to attempt to "resolve[] the complaint to the

---

[11] Adding to the confusion, the October IEP—apparently because of an oversight—listed a class size of 12:1+1 on its second page, unchanged from the August IEP description. In contrast to the document's first page, which specified 15:1+1 classes in academic areas, the second page read: "Based on the information presented the committee recommends a special, 12-1+1 for English, Social Studies, Science, and Math with related services as per the IEP." Jt. App'x 441.

satisfaction of the parents." 20 U.S.C. § 1415(f)(1)(B)(ii). Further contributing to the letter's untimeliness, it was not delivered to the parents (they assert) until November 1, 2016, the day that they finally signed a contract with Eagle Hill for M.S.'s seventh-grade year.

###### G.    Due Process Hearing Before an Impartial Hearing Officer

If objecting parents and a school district do not reach a settlement during the thirty-day resolution period, the next step is a "due process hearing." 20 U.S.C. § 1415(f)(1)(B)(ii); *see also* 34 C.F.R. § 300.510(b)(1). In New York state, this hearing takes place before an "impartial hearing officer" ("IHO") employed by the state. N.Y. Educ. Law § 4404(1)(a); N.Y. Comp. Codes R. & Regs. tit. 8, § 200.5. An IHO may find that a school district denied a child a FAPE based on the district's procedural errors occurring in the development of the IEP, deficiencies in the substance of the IEP's educational program, or both. *See L.O. v. N.Y.C. Dep't of Educ.*, 822 F.3d 95, 109 (2d Cir. 2016).

On November 28, 2016, M.S.'s parents and representatives of the District attended a due process hearing presided over by IHO Carl L. Wanderman. From January through March 2017, the IHO conducted five additional hearings. During the proceedings, he heard testimony from the District's Director of Pupil Personnel Services (Rosen), special education teacher Sabella, occupational therapist Susan Berman, special education teacher Dina Cahill, speech and language pathologist Elizabeth Mazzei, the parents' educational expert (Dr. Dorta), and C.S.

As documentary evidence, Yorktown introduced the October IEP, which Yorktown's counsel referred to as the "corrected IEP."[12] Jt. App'x 260. Because the due

---

[12] Parties in due process hearings are broadly empowered to introduce relevant evidence, including documentary and testimonial evidence, subject only to limitations imposed by the

16

process complaint on which the parents were proceeding addressed the August IEP, the IHO permitted the parents to amend their complaint to address the October IEP as well. Their amended complaint asserted that Yorktown denied M.S. a FAPE for two main reasons: (1) the August IEP offered a 12:1+1 class, but Yorktown was incapable of implementing that configuration at the middle school; and (2) to the extent the October IEP was operative, a 15:1+1 class size was too large to provide M.S. a FAPE.

The parents also maintained that Yorktown denied M.S. a FAPE because of certain procedural violations of the IDEA. When parents rely on procedural violations to establish a school district's denial of a FAPE, they must "articulate how a procedural violation resulted in the IEP's substantive inadequacy or affected the decision-making process." *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 139 (2d Cir. 2013). "Multiple procedural violations may cumulatively result in the denial of a FAPE even if the violations considered individually do not." *R.E.*, 694 F.3d at 190.

The IHO issued his written decision in April 2017. He found that Yorktown made procedural errors in its interactions with C.S. and S.S. Significantly, he determined that the District erred procedurally in its August IEP by offering M.S. a 12:1+1 class size that Yorktown "did not intend to implement." Jt. App'x 237. Nonetheless, he concluded that this procedural violation—even when considered in combination with any errors that the District made by amending the IEP in late October—did not deny M.S. a FAPE. *Id.* at 241.

He cited two factual findings in support of this conclusion. First, he found that C.S. "was aware that what was intended to be reflected in the IEP at the meeting of June 9th was a class of 15:1+1." *Id.* at 237. In other words, in the IHO's view, C.S. understood

---

IHO. *See* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.5(j)(3)(xii). Parties have the right to "compel the attendance of witnesses and to confront and question all witnesses at the hearing." *Id.*

17

the 12:1+1 shown in the August IEP to be a mistake, so any procedural problems encountered in correcting the error did not prevent the parents from knowing which class size Yorktown *meant* to recommend and did not prevent them from relying on that in their late August enrollment decision. But even had C.S. not been aware of the actual intended class size, the IHO reasoned, the evidence established that C.S. opposed a 12:1+1 class size as well as a 15:1+1 size, finding them both too large. In light of this view, any procedural error committed by the District in its confusion of the 12:1+1 and 15:1+1 class size did not affect the parents' evaluation and rejection of the IEP or their decision-making process.

Having ruled that M.S. was not denied a FAPE based on a procedural violation, the IHO turned to the substance of M.S.'s IEP, focusing on whether the October IEP, with its 15:1+1 class size, provided M.S. with a FAPE. He focused on the October IEP rather than the August IEP because (in his words) the IEP developed at the June 9, 2016 meeting and transmitted at the end of August was "corrected at the Resolution session." Jt. App'x 241. The IHO concluded that the 15:1+1 class and the other aspects of the October IEP provided M.S. a FAPE because they were "reasonably calculated to allow the child to learn and progress." *Id.*

H.      Appeal to the State Review Officer

C.S. and S.S. appealed,[13] and in 2017 the State Review Officer ("SRO"), Justyn P. Bates, reversed the IHO's decision. Citing this Court's decision in *R.E. v. New York City*

_____

[13] In New York, IHO decisions are appealed to a review officer in the State Education Department. N.Y. Comp. Codes R. & Regs. tit. 8, § 200.5(k)(1); N.Y. Educ. Law § 4404(2). The State Review Officer ("SRO") conducts a de novo review of the IHO decision. *See* 34 C.F.R. § 300.514(b) (requiring that decisions on appeal be made based upon "the entire hearing record" as well as "additional evidence if necessary," resulting in "an independent decision"); N.Y. Educ. Law § 4404(1)(d)(2) ("A state review officer of the education department shall review and may modify, in such cases and to the extent that the review officer deems necessary,

*Department of Education*, 694 F.3d 167 (2d Cir. 2012), SRO Bates wrote, "The Second Circuit has described the resolution period as the timeframe within which the district has to remedy any deficiencies in a challenged IEP without penalty." Jt. App'x 196. Although Yorktown "attempted to correct the June 2016 IEP during the resolution session," he continued, "the evidence is far from clear that the district actually provided the corrected IEP to the parent within the resolution period." *Id.* at 197.

In the SRO's view, the statute gave Yorktown until October 26, 2016, to amend the IEP "without penalty" following the resolution session. *Id.* at 196. The record evidence showed, however, that the District did not send an amended IEP to C.S. and S.S. until October 27, 2016—one day after the thirty-day resolution period expired—and it appears not to have been delivered to the parents until several days later. Because the October IEP was not timely delivered, the SRO concluded that he could not consider it in his analysis of whether Yorktown provided M.S. with a FAPE. Under *R.E.*, the SRO explained, an IEP cannot be judged by something other than "its content at the close of the resolution period," and a school district cannot "benefit[] from the use of retrospective evidence . . . that the student's program would have been materially different than what was offered in the IEP." Jt. App'x at 196 (citing *R.E.*, 694 F.3d at 188). As a result, the SRO explained, Yorktown had to defend the August IEP and its proposed 12:1+1 class. Yorktown "offered no proof that a 12:1+1 special class was available," the SRO wrote. *Id.* at 197. Accordingly, he was "constrained to find that the district was not able to implement the student's program at the start of the 2016-17 school year." *Id.* It followed, then, that Yorktown failed to offer M.S. a FAPE. *See id.* And because the SRO also found that Eagle Hill was an appropriate placement for M.S. and

in order to properly effectuate the purposes of this article, any determination of the impartial hearing officer relating to the determination of the nature of a child's handicapping condition, selection of an appropriate special education program or service and the failure to provide such program and require such board to comply with the provisions of such modification.").

that no equitable considerations weighed against awarding tuition reimbursement to the parents, he ordered Yorktown to reimburse C.S. and S.S. for M.S.'s Eagle Hill tuition for the 2016-17 school year.

The SRO also made alternative findings. He observed that "there ha[ve] been virtually no state administrative or reported court cases applying *R.E.* that address . . . the outer boundaries of a district's ability to modify an IEP using the resolution process in the manner described above"—that is, to modify the IEP unilaterally during the thirty-day resolution period. Jt. App'x 197. Thus, evaluating the particulars of the October IEP, including its 15:1+1 class size recommendation, and M.S.'s needs, the SRO concluded that if the October IEP were operative, it would have provided M.S. with a FAPE.

## I.        District Court Action

The IDEA permits a dissatisfied party to challenge an SRO's decision in state or federal court. 20 U.S.C. § 1415(i)(2)(A). Accordingly, in August 2017, Yorktown filed this action in the United States District Court for the Southern District of New York. In its complaint, Yorktown alleged:

> The SRO erred as a matter of law in concluding that *R.E. v. New York City Dep't of Educ.*, 694 F.3d 167 (2d Cir. 2012), mandates that a corrected IEP that is issued to a learning disabled student's parents 1 day after the expiration of the 30-day resolution period, especially where, as here, the defendant Parents were admittedly made fully aware of the error and correction during the resolution period, cannot be relied upon for determining whether the Student was provided a FAPE through the corrected IEP.

Jt. App'x 19-20.

The parties cross-moved for summary judgment. On January 23, 2019, Judge Briccetti granted summary judgment to C.S. and S.S. Like the SRO, the district court acknowledged that *R.E.* might "permit[] the District to unilaterally amend the IEP

20

during the resolution period," but the court explained that even if that were the case, Yorktown had "failed to do so." Jt. App'x 179. The district court reasoned that Yorktown's "failure to send the Parents a copy of the modified IEP during the resolution period is fatal to its argument that it amended the IEP" because "New York regulations specifically require that a parent 'receive a copy of the document that amends or modifies the IEP.'" *Id.* (quoting N.Y. Comp. Codes R. & Regs. tit. 8, § 200.4(g)(1)(iii)).

The district court further concluded that Yorktown was precluded from maintaining—based on evidence that C.S. understood that Yorktown intended to recommend a 15:1+1 class in the August IEP—that the August IEP provided M.S. with a FAPE. Judge Briccetti found that the record left it "far from clear" that C.S. and S.S. understood Yorktown intended to recommend a 15:1+1 class size in the August IEP. Jt. App'x 180. Because the written August IEP recommended a class size of 12:1+1 that Yorktown was unable to provide, the district court concluded, C.S. and S.S. were entitled to reimbursement for the cost of sending M.S. to Eagle Hill for M.S.'s seventh-grade year.

Yorktown timely appealed the district court's judgment.

**DISCUSSION**

We review de novo a district court's grant of summary judgment in an IDEA action. *A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009). In a district court proceeding under the IDEA, the parties and the court typically style the decision as a ruling on a motion for summary judgment, but "the procedure is in substance an appeal from an administrative determination, not a summary judgment motion." *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 226 (2d Cir. 2012). The district court therefore "engage[s] in an independent review of the

21

administrative record and make[s] a determination based on a preponderance of the evidence." *Id.* at 240.

In conducting such an independent review, courts "must give due weight to [the state administrative] proceedings, mindful that the judiciary generally lacks the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy." *Id.* Where an IHO and SRO reach conflicting conclusions, "a court must defer to the SRO's decision on matters requiring educational expertise unless it concludes that the decision was inadequately reasoned, in which case a better-reasoned IHO opinion may be considered instead." *R.E.*, 694 F.3d at 189. On "issues of law," however, "such as the proper interpretation of the federal statute and its requirements," courts owe no deference to state hearing officers. *Lillbask ex rel. Mauclaire v. State of Conn. Dep't of Educ.*, 397 F.3d 77, 82 (2d Cir. 2005).

The district court concluded that the August IEP offered a 12:1+1 class for M.S. and did not provide a FAPE for M.S. because Yorktown did not have a 12:1+1 class in which to place M.S. for her seventh-grade year. On appeal, Yorktown does not challenge that conclusion. Rather, Yorktown takes issue with the district court's conclusion that Yorktown failed effectively to amend the August IEP as reflected in the October IEP. Because—Yorktown contends—the October IEP *did* recommend a FAPE to M.S. (as the SRO found), the parents are not entitled to reimbursement for tuition they paid to cover the 2016-17 academic year at Eagle Hill.

Yorktown presents two essentially legal theories in support of its contention: first, it proposes that the October 6 resolution session should be deemed to have been a meeting of the CSE, albeit an incomplete one, and therefore the change in class size that was discussed there effectively amended the August IEP; second, citing *R.E.*, 694 F.3d at 188, it suggests that school districts may unilaterally amend an IEP during the thirty-day resolution period "without penalty," and may rely on such an amended IEP in the

due process hearing that follows the resolution period. "Absent any legal prohibition on this Court relying on the amended/corrected IEP as the source for the provision of a FAPE to the student," Yorktown urges, this Court should conclude, as did the IHO, that the October IEP was the operative IEP for purposes of the parents' claim to tuition reimbursement, and that the parents' claim should be denied because the October IEP provided M.S. a FAPE. Appellant's Br. 41.

Finally, as an equitable matter, Yorktown submits that even if it ran afoul of the IDEA's procedural constraints by amending the IEP on the fly, the parents' reimbursement claim should be rejected because the District's procedural violations did not prejudice the parents: according to Yorktown, C.S. and S.S. were in fact aware that Yorktown intended to recommend a 15:1+1 class size for M.S., and the parents intended to reject an IEP based on that class size regardless of the procedural posture of the putative amendment.

These arguments assume that the IDEA allowed Yorktown unilaterally to amend M.S.'s IEP during the thirty-day resolution period and that C.S. and S.S. were not entitled to rely on the IEP as written when placing M.S. at Eagle Hill and filing a due process complaint. Indeed, the IHO, SRO, and district court's statements seemed to reflect a willingness to assume the same insofar as they focused on the untimeliness of the school district's post-resolution session amendment rather than the notion of unilateral amendment during the resolution period.[14] In at least superficial alignment

---

[14] *See* Jt. App'x 241 (IHO holding that "the IEP in issue, . . . as corrected at the Resolution session held on October 7, 2016, provided the child with FAPE"); Jt. App'x 211 (SRO explaining that "the district failed to offer the student a FAPE" because "the district failed to provide the parent with a revised IEP recommending the 15:1+1 special class . . . within the resolution period"); Jt. App'x 179 (district court explaining that "[t]he District's failure to send the Parents a copy of the modified IEP during the resolution period is fatal to its argument that it amended the IEP"). The district court expressed some skepticism about Yorktown's right to unilaterally amend an

with this understanding, our panel stated in *R.E.* that, once parents have filed a due process complaint and identified what they see as an IEP's deficiencies, the resolution period provides school districts with "thirty days to remedy these deficiencies without penalty." *R.E.*, 694 F.3d at 188. We stated that the adequacy of the IEP is then "judged by its content at the close of the resolution period." *Id.*

In *R.E.*, however, the school district made no unilateral amendment such as Yorktown presented the parents with here: rather (and as we explore further below), *R.E.* concerned a school district's right to introduce evidence of what educational services a student would actually have been provided under a challenged IEP beyond what the written IEP stated. As M.S.'s parents correctly observe, and as *R.E.* did not address, "[n]othing in the IDEA or its regulations concerning the resolution process expressly provides school districts the right to unilaterally revise IEPs during the resolution period." Appellees' Br. 26. We now hold that, although the IDEA permits a school district to *propose* changes to an IEP during the resolution period, it does not permit a district to unilaterally amend an IEP during this period. Consistent with our prior interpretations of the statute, this holding ensures that parents who decide to reject a proffered public placement, place their child in a suitable private school, and seek reimbursement as part of their due process complaint can rely on the contents of their child's written IEP when making the decision to do so. *See Reyes ex rel. R.P. v. N.Y.C. Dep't of Educ.*, 760 F.3d 211, 220 (2d Cir. 2014). To the extent that dicta in *R.E.* suggested otherwise, we now clarify the scope of the Court's ruling in that case.

---

IEP during the resolution period, but its analysis assumed *arguendo* that Yorktown had such a right. *See* Jt. App'x 179 ("Even if [*R.E.*] permits the District to unilaterally amend the IEP during the resolution period, the District failed to do so in any of the three ways described above.").

**I.     Our decision in *R.E.***

Yorktown highlights language in *R.E.* to argue that it was entitled to unilaterally amend M.S.'s IEP during the resolution period, and that as a result, the October IEP controls the FAPE determination here. We reject this argument. Yorktown is correct that this Court stated in *R.E.* that an IEP may be amended during the resolution period. *See* 694 F.3d at 188. Yorktown is wrong, however, that the *R.E.* Court held that a school district may do so unilaterally or that such an IEP as so amended becomes the basis for determining whether the school district offered the child a FAPE. Appellant's Br. 31-32.

**A.     *R.E.*'s Holding**

*R.E.* addressed the authority of school districts to supplement an IEP with retrospective testimony about how the IEP would have been carried out, and the authority of courts to consider such testimony when adjudicating whether the IEP offered a FAPE. In *R.E.*, the plaintiff parents filed due process complaints contending that IEPs provided for their children by the New York City Department of Education ("NYCDOE") denied their children FAPEs. In defending the IEPs in each case at the administrative level, NYCDOE relied not just on the written IEP, but was also allowed to introduce evidence about the additional services that it would actually have provided under the IEP had the children attended NYCDOE schools. This evidence substantially supplemented the information provided in the children's written IEPs. *R.E.*, 694 F.3d at 185. We held that it was error to allow the NYCDOE to introduce such evidence after the fact, and error for the adjudicators to consider it in determining whether the IEPs denied these students a FAPE. We explained:

> [T]estimony regarding state-offered services may only explain or justify what is listed in the written IEP. Testimony may not support a modification that is materially different from the IEP, and thus a deficient IEP may not be effectively rehabilitated or amended after the fact through testimony regarding services that do not appear in the IEP.

25

*Id.*

The *R.E.* court recognized parents' "considerable reliance interests" when they choose to enroll their child in a private school and to seek reimbursement for tuition on the premise that the proposed IEP is inadequate. *Id.* at 186. Parents must decide whether to place their child in a private school based on the services outlined in the IEP, we reasoned, and not based on whatever services school authorities later testify the district would actually have provided. To this end, the *R.E.* Court did not preclude school districts from relying on testimony that further "explain[ed]" the services listed in an IEP. *Id.* at 185. It held, rather, that school districts may not attempt to "rehabilitate[] or amend[]" an IEP's listed services through such post hoc testimony as was presented in *R.E. Id.*

*R.E.* thus established an important procedural protection for parents challenging their child's IEP: parents may rely on the text of the IEP as it stands when they decide to place their child in a private school. In so holding, we sought to eliminate the risk that parents would be denied reimbursement for reasons not apparent from the IEP: sandbagging the parents, in effect, because the child would have received particular services not specified in the IEP and likely unknown to the parents. In the panel's words: "In determining the adequacy of an IEP, both parties are limited to discussing the placement and services specified in the written plan and therefore reasonably known to the parties at the time of the placement decision." *Id.* at 187.

B.      *R.E.'s* Dictum

After explaining this rule, the *R.E.* court addressed the concern advanced by the school district there that the rule would enable opportunistic parents "to take advantage of a school district by failing to alert it to IEP deficiencies and subsequently recover tuition based on those deficiencies." *Id.* at 188. The fear was that, if a hearing officer was

constrained to consider the text of the errant IEP alone, parents could seize upon innocent errors in an IEP, fail to notify the school district of those errors, and then win reimbursement and harm the district financially—despite having made the placement choice that they would have made without regard to the district's proffered IEP. Without the ability to illustrate what services would *in practice* have been provided, the school district would be unfairly stuck defending the plain text of the IEP, errors and all, when in fact a satisfactory IEP was within its reach.

The *R.E.* Court identified the thirty-day resolution period as offering the answer to this concern. First, the Court noted that parents filing a due process complaint must list *all* the deficiencies they identify in their child's IEP. *Id.* at 187; *see also* 20 U.S.C. § 1415(b)(7)(A)(ii)(III). Then, after receiving the comprehensive list, the school district "has thirty days to remedy these deficiencies without penalty," the *R.E.* Court stated. 694 F.3d at 187-88. The Court commented further, in language we now question:

> If, at the end of the resolution period, the parents feel their concerns have not been adequately addressed and the amended IEP still fails to provide a FAPE, they can continue with the due process proceeding and seek reimbursement. The adequacy of the IEP will then be judged by its content at the close of the resolution period.

*R.E.*, 694 F.3d at 188. By giving the school district a chance to correct or revise the IEP, the Court reasoned, the resolution period prevented parents from taking advantage of innocent errors in an IEP's text. *Id.*

This description of what occurs during the IDEA resolution period might be read to imply that the school district is entitled to make unilateral amendments to the IEP during the course of the resolution period. To draw such an implication would be incorrect. But, further, the contested language was not necessary to the Court's decision,

27

because in the cases at bar, no such substantive amendments had occurred. *See id.* at 176-77, 179-80, 182-83.[15]

Because the language relied on by Yorktown addressed only a potential objection to the rule the Court adopted and did not address a situation presented to the court, we think the Court's discussion of amendment during the resolution period was non-binding dictum. *See United States v. Rubin,* 609 F.2d 51, 69 n.2 (2d Cir. 1979) (Friendly, *J.,* concurring) ("A judge's power to bind is limited to the issue that is before him."), *aff'd,* 449 U.S. 424 (1981). Of course, "[w]e do not suggest that we may ignore" the language in *R.E.*: even non-binding statements from prior panels of this Court "deserve close consideration." *Jimenez v. Walker*, 458 F.3d 130, 142 (2d Cir. 2006). But, as explained below, when subject to closer scrutiny in light of the factual record presented here, we see that the text and structure of the IDEA necessarily foreclose the school district's unilateral substantive amendment of an IEP during the thirty-day resolution period. Rather, the resolution period is designed to foster a mutual process, in line with the cooperative CSE that is the hallmark of the IEP development process, as we described above.

## II.   The Text and Structure of the IDEA

### A.   Text

First, the text of the IDEA provides procedures by which a school district and parents can *agree* to amend an IEP during the resolution period; it gives no evidence of a Congressional intent to grant school districts the right to amend an IEP unilaterally during the resolution period or, indeed, at any time. The IDEA provides that parents

---

[15] We note that the Court referred specifically only to a school district's ability to "cure" the "inadvertent or . . . good faith omi[ssion] of a required service from the IEP." *R.E.*, 694 F.3d at 188.

and a school district may convene a resolution session; may agree to mediate the dispute; or may otherwise agree in writing to waive holding a resolution session. 20 U.S.C. § 1415(f)(1)(B). If the parents and school district reach an agreement during the resolution session or mediation, they must sign a legally enforceable settlement agreement setting forth the terms of the resolution. *Id.* § 1415(e)(2)(F), (f)(1)(B)(iii)-(iv). Nowhere does the statute provide that school districts may act without the parents' agreement to amend the IEP during the resolution period, much less rely on a new IEP in the due process hearing to argue that the student was provided a FAPE. The statute's emphasis on agreement, its detailed prescription of procedures for reaching agreement, and its concurrent silence on unilateral action are difficult to square with the notion that the IDEA permits the school district to act unilaterally during the resolution period.[16]

In fact, the statute contains multiple indications that any change made to the IEP during the resolution period must be agreed to by both the parents and the school district. For instance, either party may void a settlement agreement reached at a resolution session within three days of the agreement's execution. *Id.* § 1415(f)(1)(B)(iv). Also, the statute provides that the school district personnel may not be accompanied by counsel at the resolution session unless the parents are as well. *Id.* § 1415(f)(1)(B)(i)(III). The IDEA thus presents the resolution period as an interlude during which school district representatives may talk with the parents, and possibly satisfy the parents' concerns, all the while going to great lengths to protect parents' rights and their

---

[16] The IDEA does describe the resolution session as providing the school district with "the opportunity to resolve the complaint." 20 U.S.C. § 1415(f)(1)(B)(i)(IV). We read this phrase, however, simply as a general description of the resolution session's multilateral purpose. Although the School District points to § 1415(f)(1)(B) in its briefing, it admits that "nothing in the resolution session provisions at 20 U.S.C. § 1415(f)(1)(B) provides for any formal IEP amendment notice or process either during the resolution session period or when the act of 'amendment' . . . is deemed to have occurred." Appellant's Br. 33.

authority to proceed to a due process hearing if they so choose. The statute's insistence on communication and its careful articulation of procedural protections for parents stand at odds with a rule that would allow school districts to unilaterally amend their IEPs during the resolution period and affect the FAPE determination on which a child's schooling options rest.

The IDEA also directly addresses how parties may amend an IEP. It sets out detailed procedures for amendment that nowhere allude to, never mind identify, a right for school districts to unilaterally amend an IEP during the resolution period. For example, a provision entitled "Amendments" provides, "Changes to the IEP may be made either by the entire IEP Team or, as provided in subparagraph (D), by amending the IEP rather than by redrafting the entire IEP." *Id.* § 1414(d)(3)(F). Subparagraph D, set out in the margin, does not mention resolution periods.[17] That these amendment procedures do not discuss unilateral amendment during the resolution period further supports the conclusion that Congress did not intend to allow what the school district here urges. *See K.A. ex rel. F.A. v. Fulton County Sch. Dist.*, 741 F.3d 1195, 1207-08 (11th Cir. 2013) ("In light of the IDEA's lengthy and excruciatingly detailed procedural protections, we decline to read into the statute a significant procedural requirement that Congress did not express."); *see also M.C. ex rel. M.N. v. Antelope Valley Union High Sch.*

---

[17] Subparagraph D provides:

> In making changes to a child's IEP after the annual IEP meeting for a school year, the parent of a child with a disability and the local educational agency may agree not to convene an IEP meeting for the purposes of making such changes, and instead may develop a written document to amend or modify the child's current IEP.

20 U.S.C. § 1414(d)(3)(D).

*Dist.*, 858 F.3d 1189, 1197 (9th Cir. 2017) ("An IEP, like a contract, may not be changed unilaterally.").

Finally, the IDEA's description of due process hearings conflicts with the notion of a school district's unilateral right to make IEP amendments during the resolution period. The Act provides that a court or hearing officer may order a school district to reimburse parents for the cost of unilaterally enrolling their child in a private school "if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child *in a timely manner prior to that enrollment*." 20 U.S.C. § 1412(a)(10)(C)(ii) (emphasis added). The statute thus contemplates a due process hearing that examines whether the IEP provided the child with a FAPE *before* the parents' enrollment of their child in a private school—and that does not examine the IEP as amended following the parents' due process complaint.

Given just the absence of textual support for a school district's right to unilaterally amend an IEP during the resolution period, and the tension between that right and the text of other IDEA provisions, we would decline to read such a substantial provision into the statute. Yet, as explained below, this putative right also makes little sense when considered in the context of the broader statute.

B.      Structure

The IDEA directs parents to provide the school district with written notice ten days in advance of placing their child in a private school, and to include in this notice a statement of their "concerns" regarding the proffered IEP. 20 U.S.C. § 1412(a)(10)(C)(iii); *see also* 34 C.F.R. § 300.148(d) (same). If parents do not provide the requisite notice, any reimbursement they later seek by filing a due process complaint may be "reduced or denied," *id.*, as we discussed above, *see* Part II.D, *supra.* This provides parents a powerful incentive to comply. *See M.C.*, 226 F.3d at 68.

The ten-day notice requirement gives school districts an opportunity to discuss with parents their objections to the IEP and to offer changes to the IEP designed to address those objections—all before the parents enroll their child in a private school and file a due process complaint. *See J.S.*, 826 F. Supp. 2d at 672 ("[T]he purpose of the notice requirement is to give the district a meaningful opportunity to minimize its expenses by developing its own IEP that would provide the child with a FAPE within the School District."). This does not mean that a school district may unilaterally amend an IEP during the ten-day notice period; but, if parents unreasonably reject the school district's proposed changes to the IEP, or are otherwise uncooperative, courts and hearing officers are fully empowered to deny them reimbursement. *See* 20 U.S.C. § 1412(a)(10)(C)(iii)(III) (providing that reimbursement may be reduced or denied "upon a judicial finding of unreasonableness with respect to actions taken by the parents").

School districts thus may seek to correct the IEP during the ten-day notice period, in which they have knowledge of the parents' objections. They may defend against a claim for tuition reimbursement by pointing out that parents did not cooperate in the revision of the IEP, or that the corrected IEP, if accepted by the parents, would have provided the child with a FAPE. *See, e.g.*, *Ashland Sch. Dist. v. Parents of Student E.H.*, 583 F. Supp. 2d 1220, 1228 (D. Or. 2008) (denying reimbursement despite parents' participation in IEP meeting following notice of withdrawal based in part on finding that, at time of meeting, "[p]arents were not about to transfer [their child] back to the public school system"), *aff'd*, 587 F.3d 1175 (9th Cir. 2009).[18] The ten-day notice

---

[18] *Cf. P.K. ex rel. S.K. v. N.Y.C. Dep't of Educ. (Region 4)*, 819 F. Supp. 2d 90, 117-18 (E.D.N.Y. 2011) (declining to deny or reduce reimbursement where parents noted "they were willing to meet with the Department to try to resolve the matter" and parent's testimony about basis for refusing school district's proposed placement was "credible"), *aff'd*, 526 F. App'x 135 (2d Cir. 2013); *Wood v. Kingston City Sch. Dist.*, No. 08-cv-1371 (NAM) (RFT), 2010 WL 3907829, at *9

period thus provides to the school district the very protection that the *R.E.* Court described as being offered by the resolution period: it can prevent opportunistic parents from "tak[ing] advantage of a school district by failing to alert it to IEP deficiencies and subsequently recover[ing] tuition based on those deficiencies" because any such deficiencies must be identified in the parents' ten-day notice letter and can be discussed and addressed *before* the parents decide to reject the IEP and to place their child in a private school that will offer the instruction they seek. 694 F.3d at 188.

For this reason, Yorktown's insistence that barring the School District's unilateral amendment during the resolution period will permit parents to engage in "'gotcha' tactic[s]" is misplaced. Appellant's Br. 35. Yorktown could have met with C.S. and S.S. and addressed their concerns during the ten-day notice period. Although it had not yet sent a written IEP to C.S. and S.S., Yorktown could have brought the August IEP to the meeting. Had it done so, it would have been apparent to all that the IEP showed a 12:1+1 class size recommendation, and Yorktown could have corrected the error, making clear that the IEP was *supposed* to provide for a 15:1+1 class, and it could have offered to change the IEP to reflect that fact and provide clarity to the parents regarding their options. It was no substitute to clarify the mistake during the resolution session, given that C.S. and S.S. had already placed M.S. at Eagle Hill at that point.

It is true that, during the ten-day notice period, Yorktown could not have unilaterally amended the IEP, and that C.S. and S.S. could still have proceeded to file a due process complaint contending that they withdrew their child based on an IEP that recommended a 12:1+1 class that the school district was unable to provide. Yet in this circumstance the record would show that an error had been made and that the parents

_____

(N.D.N.Y. Sept. 29, 2010) (declining to deny parents reimbursement based on "uncooperativeness" after parents did not respond to school district's invitation to meet and discuss parents' concerns during ten-day notice period).

had been fully apprised of the error. A court or hearing officer would be fully empowered to consider the fact that C.S. and S.S. *were* made aware that Yorktown intended to offer a 15:1+1 class for M.S. before the parents chose to enroll M.S. in a private school. In that event, the court or hearing officer could reduce or deny C.S. and S.S.'s reimbursement accordingly.[19]

This Court's previous rulings barring the use of retrospective testimony to alter an IEP have been aimed, consistent with the IDEA's language and purpose, "to ensure that parents can make placement decisions for their children based solely on the information made available to them by the [school district] at the time of the placement decision." *Reyes*, 760 F.3d at 220. Preventing schools from retroactively amending IEPs during the resolution period serves this same end.

To hold otherwise would introduce a measure of absurdity into the IDEA process. As a default rule, parents must bring a due process complaint under the IDEA within two years of the date that they knew or should have known about the school district's conduct that forms the basis of the complaint. 20 U.S.C. § 1415(f)(3)(C). New York observes this two-year statute of limitations. N.Y. Educ. Law § 4404(1)(a). Thus, parents who believe that their child's school district is not providing a FAPE because of a deficient IEP may (1) give ten days' notice of their plan to move their child out of the school district, (2) enroll their child in a suitable private school, and (3) opt not to file their due process complaint until well over a year later, long after their child has completed the contested year at the private school. Under the rule that Yorktown

_____

[19] This approach avoids perverse incentives. As amici note, if unilateral amendment during resolution periods were permitted, school districts would have an incentive to offer lower cost IEPs and then amend them to provide more services only if and when parents filed a due process complaint. *See* Amicus Br. of Mobilization for Justice, Inc. *et al.* at 24 ("Districts could create an IEP with limited, low-cost services, and then wait and see if the parents file a due process complaint.").

advocates, the school district could then unilaterally amend the IEP during the resolution period, post-due process complaint, to offer a more generous or suitable program. And yet the school district could argue based on the amended IEP that it provided the child with a FAPE, despite the fact that the IEP did not exist during the child's school year. This would give IDEA procedures a life of their own, wholly divorced from their intended meaning and of little use to parents, courts, and school districts alike.

C.S. and S.S. were entitled to rely on the August IEP as written when they decided to place M.S. at Eagle Hill at the end of August, before the school year started. It was the only IEP that they had received at that time. The Court in *R.E.* recognized that "[i]n order for this system to function properly, parents must have sufficient information about the IEP to make an informed decision as to its adequacy prior to making a placement decision." 694 F.3d at 186. To make good on this promise, school districts cannot be permitted to unilaterally amend IEPs during the resolution period.

For reasons outlined above, we reject Yorktown's other arguments as well. To accept Yorktown's contention, made only in passing, that the resolution session *itself* constituted an (incomplete) meeting of M.S.'s CSE and that it could make unilateral changes to her IEP on that basis, would undermine the parents' right to rely on the IEP as-written at the time they decided to place M.S. in a different school and to file a reimbursement action. Similarly, to accept Yorktown's argument that reimbursement should be denied here because the parents were aware that Yorktown intended to include a 15:1+1 class size in the August IEP would undermine the parents' ability to rely on the representations in the written IEP—regardless of what they expected the writing to provide before they received it. We emphasize that the main source of confusion here was Yorktown's repeated failures to provide the parents with an accurate and timely IEP. *See supra* at 8-10, 12-15. The statute does not permit Yorktown

to unilaterally "correct" its substantive errors well after the time for such action has passed.

## CONCLUSION

The IDEA does not provide school districts the right to unilaterally amend IEPs during the resolution period. Because Yorktown argues only that it provided M.S. a FAPE based on her IEP as unilaterally amended during the resolution period, and does not dispute that the unamended IEP denied M.S. a FAPE, we conclude that Yorktown denied M.S. a FAPE for her 2016-17 school year. The district court's other conclusions relevant to the reimbursement order—those about the suitability of the Eagle Hill placement and the equitability of the parents' conduct—are not challenged on appeal and therefore stand unaltered.

Accordingly, the judgment of the district court is **AFFIRMED**.